**Electronically Filed**
**Supreme Court**
**SCWC-19-0000491**
**03-JUN-2022**
**09:33 AM**
**Dkt. 23 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

STATE OF HAWAIʻI,
Petitioner and Respondent/Plaintiff-Appellant,

vs.

TIANA F.M. SAGAPOLUTELE-SILVA,
Respondent and Petitioner/Defendant-Appellee.

SCWC-19-0000491

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-19-0000491; CASE NO. 1DTA-18-01227)

JUNE 3, 2022

RECKTENWALD, C.J., NAKAYAMA, J.,
AND CIRCUIT JUDGE WONG, ASSIGNED BY REASON OF VACANCY, WITH
McKENNA, J., DISSENTING SEPARATELY, WITH WHOM WILSON, J., JOINS,
AND WILSON, J., DISSENTING SEPARATELY

OPINION OF THE COURT BY RECKTENWALD, C.J.

## I. INTRODUCTION

Tiana Sagapolutele-Silva was arrested after a traffic stop in 2018 and charged with Operating a Vehicle Under the Influence of an Intoxicant (OVUII) and excessive speeding.

Sagapolutele-Silva moved to suppress any statements she made during the traffic stop on the ground that she was not advised of her Miranda[1] rights during the encounter.  The district court granted the motion, concluding that Sagapolutele-Silva was in custody during the investigation for OVUII because the investigating officers had probable cause to arrest her for excessive speeding, a petty misdemeanor.  The Intermediate Court of Appeals (ICA) affirmed.

On appeal, the State asks us to clarify when a suspect is in custody for purposes of administering the prophylactic warnings against self-incrimination required by article I, section 10 of the Hawai'i Constitution.  Although our cases have consistently stated that the custody test is one of totality of the circumstances, some of our precedent has nonetheless indicated that the presence of probable cause alone is dispositive.

We hereby clarify that a court must evaluate the totality of the circumstances to determine whether a suspect is in custody such that Miranda warnings are required before a police officer may interrogate them.  That formulation is consistent with the purposes of Miranda since it focuses the inquiry on whether police have created a "coercive atmosphere."

---

[1]    Miranda v. Arizona, 384 U.S. 436 (1966).

See, e.g., State v. Melemai, 64 Haw. 479, 482, 643 P.2d 541, 544 (1982) (Miranda warnings are required when "the totality of circumstances created the kind of coercive atmosphere that Miranda warnings were designed to prevent"); State v. Wyatt, 67 Haw. 293, 299, 687 P.2d 544, 549 (1984) ("the ultimate test is whether the questioning was of a nature that would subjugate the individual to the will of his examiner and thereby undermine the privilege against compulsory self-incrimination" (citations omitted) (internal quotation marks omitted)).

Almost forty years ago, we considered the coerciveness of roadside questioning in Wyatt. The defendant there was ordered to pull over after officers observed her driving at night with no headlights on, and officers then smelled alcohol emanating from her vehicle. We held that Miranda warnings were not required at that point since the circumstances were not intimidating or coercive, but rather constituted "on-the-scene questioning of brief duration conducted prior to arrest in public view." Wyatt, 67 Haw. at 300, 687 P.2d at 550; see also State v. Kuba, 68 Haw. 184, 188, 706 P.2d 1305, 1309 (1985) (holding, under facts "almost indistinguishable" from Wyatt, that Miranda warnings were not required before the police began asking questions). Wyatt and Kuba have not been overruled and their totality-of-the-circumstances approach should be applied

here.  Accordingly, probable cause is relevant but not dispositive to determining whether a person is in custody.

This case illustrates why it is important to assess the relevance of probable cause in light of all the circumstances.  Sagapolutele-Silva was observed driving at thirty-two miles per hour over the speed limit; if she had been driving just three miles per hour slower, the officer would not have had probable cause to arrest her for the offense of excessive speeding.  Hawai'i Revised Statutes (HRS) § 291C-105(a)(1) (2007).[2]  That three-mile-per-hour difference had no effect on the coerciveness of the situation from Sagapolutele-Silva's point of view.  Under the totality of the circumstances, Sagapolutele-Silva was not in custody when she was pulled over or during the administration of the standardized field sobriety test (SFST).  Accordingly, Miranda warnings were not required, and there was no illegality which would taint her subsequent statements as fruit of the poisonous tree.

We therefore vacate the district court's order suppressing Sagapolutele-Silva's statements, vacate the judgment of the ICA affirming that Sagapolutele-Silva was in custody during the traffic stop, and remand the case to the district court for further proceedings.

---

[2]    See infra note 5.

4

## II.  BACKGROUND

Sagapolutele-Silva was arrested after a traffic stop on March 31, 2018.  She was charged in the District Court of the First Circuit[3] with one count of OVUII, in violation of HRS §§ 291E-61(a)(1) and/or (a)(3) (Supp. 2015),[4] and one count of excessive speeding, in violation of HRS § 291C-105(a)(1) (2007).[5]

Sagapolutele-Silva moved to suppress any statements she made during the traffic stop on the ground that she was not advised of her Miranda rights during the encounter.  At the hearing on the motion, the Honolulu Police Department (HPD) officers involved in the traffic stop, Officers Franchot Termeteet and Bobby Ilae, testified.  Officer Termeteet testified to pulling over Sagapolutele-Silva after observing her driving seventy-seven miles per hour in an area where the speed

---

[3]     The Honorable Summer M. M. Kupau-Odo presided.

[4]     Sagapolutele-Silva was charged with violating HRS §§ 291E-61(a)(1) and/or (a)(3) (Supp. 2015), which provide:

> (a) A person commits the offense of operating a vehicle under the influence of an intoxicant if the person operates or assumes actual physical control of a vehicle:
>     (1) While under the influence of alcohol in an amount sufficient to impair the person's normal mental faculties or ability to care for the person and guard against casualty; [or] . . . .
>     (3) With .08 or more grams of alcohol per two hundred ten liters of breath[.]

[5]     Sagapolutele-Silva was charged with violating HRS § 291C-105(a)(1) (2007), which provides: "No person shall drive a motor vehicle at a speed exceeding[] [t]he applicable state or county speed limit by thirty miles per hour or more[.]" HRS § 291C-105(c) provides that "[a]ny person who violates this section shall be guilty of a petty misdemeanor."

limit was forty-five miles per hour, and drifting between lanes without signaling on the H-1 freeway in Honolulu. On cross-examination, Officer Termeteet testified that based on his observations of her speeding, he had probable cause to arrest Sagapolutele-Silva for excessive speeding and that after being stopped, she was not free to leave.

Officer Termeteet informed Sagapolutele-Silva "that I was stopping her for speeding"; in response, she acknowledged that she had been speeding. Officer Termeteet testified that he smelled "a strong odor of alcohol coming from within the vehicle," but he could not determine from whom the odor emanated because there were four passengers in the car. He asked Sagapolutele-Silva for her license, vehicle registration, and proof of insurance. She produced a permit for a commercial driver's license, and explained that she had a regular license but did not have it with her; she also provided him with a safety-inspection card. Officer Termeteet observed that Sagapolutele-Silva had red, watery, and glassy eyes. Officer Termeteet asked Sagapolutele-Silva if she would participate in the SFST; she agreed to do so.

Officer Ilae testified that he was "covering Officer Termeteet on a traffic stop" and administered the SFST to

Sagapolutele-Silva.[6]  After asking her again whether she would be willing to participate in the SFST, he asked a series of "preliminary questions" sometimes referred to as the medical rule-out questions: (1) "[d]o you have any physical defects or speech impediments," (2) "are you taking medication," (3) "are you under the care of a doctor or dentist," (4) "are you under the care of an eye doctor," (5) "are you epileptic or diabetic," (6) "[do you have an] artificial or glass eye," (7) "are you wearing any contact lenses or corrective lenses," and (8) "are [you] blind in any eye."  Officer Ilae testified that these questions are asked "to help [him] gauge whether or not the impairment [he is] seeing is medically related or if . . . there's a medical emergency."  He testified he would not administer the SFST if there were a medical emergency, but if someone did not want to answer the medical rule-out questions, he would nonetheless continue with the test.  On cross-examination, however, he testified he had never in fact administered the SFST without asking the medical rule-out questions.

Officer Ilae then administered the SFST.  He instructed Sagapolutele-Silva on each of the three components – the horizontal gaze nystagmus, the walk-and-turn, and the one-

---

[6]      The record does not reflect when Officer Ilae arrived on the scene.  On cross-examination, Officer Ilae testified that Sagapolutele-Silva was already out of the car when he got there.

7

leg stand – to which she replied that she understood and had no questions.  After completing the SFST and giving Sagapolutele-Silva a preliminary alcohol screening, Officer Ilae then told her "that she was over" and was being arrested.  As Officer Ilae walked back to his car with Sagapolutele-Silva following him, he heard her state that "she's not going to lie, she had a few beers but her friends [were] more impaired than she was."

The district court orally granted the motion to suppress, concluding that Sagapolutele-Silva was in custody and subject to interrogation because Officer Termeteet had probable cause to arrest her when he pulled her over.  In its written order, the district court made, as relevant here, the following findings of fact and conclusions of law:

### FINDINGS OF FACT

. . .

2.  Officer Termeteet . . . measure[d] Defendant's speed at 77 miles per hour in a 45 mile per hour zone.

. . .

5.  While following Defendant's vehicle, Officer Termeteet observed Defendant drift into lane number 1, completing a lane change without signals and then drift from lane 1 back to lane 2, completing another lane change without signals.

6.  Officer Termeteet activated his blue flashing lights and Defendant's vehicle came to a complete stop in the right shoulder lane.

7.  Officer Termeteet approached Defendant's driver's side window and noticed the odor of alcohol coming from her breath. . . . [and] from within the vehicle. . . .

8.  Officer Termeteet asked Defendant for her driver's license. . . .  Officer Termeteet asked Defendant if she

would be willing to participate in a [SFST]. Defendant verbally consented to participate in the SFST. Defendant exited her vehicle and HPD Officer [Ilae] took over the investigation.

9. When Officer Ilae arrived on scene, Officer Termeteet apprised him of his observations. Officer Ilae approached Defendant's vehicle and began conversing with her. Officer Ilae asked Defendant if she would be willing to participate in an SFST. Defendant verbally consented to participate in the SFST. . . .

10. Defendant was not free to leave while she waited for Officer Ilae to arrive.

11. Prior to Defendant exiting the vehicle, she was not free to leave.

12. Defendant was the focus of an OVUII investigation.

13. Officer Termeteet had probable cause to arrest or cite Defendant for the petty misdemeanor offense of Excessive Speeding as soon as he stopped her vehicle.

. . .

### CONCLUSIONS OF LAW

. . .

7. At the time that Defendant was sitting in her vehicle, prior to the administration of the SFST, she was not free to leave, she was the focus of an OVUII investigation and officers had probable cause to arrest [her] for at least Excessive Speeding. Officer[s] Termeteet and Ilae did not need the results of the SFST to arrest and/or cite Defendant for Excessive Speeding. Legal custody had attached.

(Footnotes omitted.)

The district court concluded that both the officers' initial questions, asking if Sagapolutele-Silva would consent to the SFST, and the medical rule-out questions, asking whether she understood the instructions, were interrogation; accordingly, Sagapolutele-Silva's answers to those questions were suppressed. The district court also suppressed all evidence obtained thereafter as fruit of the poisonous tree.

9

The State appealed the order granting the motion to suppress, and the ICA affirmed in part and vacated in part in a published opinion.  State v. Sagapolutele-Silva, 147 Hawai'i 92, 104, 464 P.3d 880, 892 (App. 2020).  As relevant here, the ICA concluded that Sagapolutele-Silva was in custody for excessive speeding "[u]nder the totality of the circumstances" because Officer Termeteet had probable cause to arrest her for that offense when she was initially stopped.  Id. at 100, 464 P.3d at 888.  The ICA held, additionally, that "due to Sagapolutele-Silva being in custody for Excessive Speeding, the medical rule-out questions, which were asked in relation to the OVUII investigation here, constituted interrogation."[7]  Id. at 101, 464 P.3d at 889.  The ICA further reasoned that although "the investigation for OVUII in this case constituted a separate and distinct investigation" from the investigation for excessive speeding, and Officer Termeteet only had reasonable suspicion of OVUII, "the failure to provide a Miranda warning when required for one crime will taint a subsequent interrogation even if the

_____

[7]     With respect to interrogation, the ICA affirmed the district court's conclusion that the medical rule-out questions were interrogation, and held that the defendant's answers to those questions were properly suppressed.  State v. Sagapolutele-Silva, 147 Hawai'i at 102, 464 P.3d at 890. Additionally, the ICA held that the defendant's spontaneous post-arrest statement that she had drunk a few beers was properly suppressed as fruit of the poisonous tree.  Id. at 104, 464 P.3d at 892.  However, the ICA held that statements made in response to being told why she was stopped were not the product of interrogation.  Id. at 103, 464 P.3d at 891.  For a discussion of interrogation during an OVUII roadside investigation, see State v. Skapinok, SCWC-19-0000476 (Haw. 2022).

10

interrogation relates to a different crime for which <u>Miranda</u> warnings were not yet required, if a defendant is still in custody."  <u>Id.</u> at 100-01, 464 P.3d at 888-89.

The State and Sagapolutele-Silva filed applications for writs of certiorari, both of which this court accepted.  The State asks us to revisit our precedent establishing an "either/or" test in which the existence of probable cause, standing alone, is enough to establish that a suspect was in custody.[8]  Sagapolutele-Silva agrees that "the fact of probable cause for arrest is not determinative on the issue of 'custody' for the purposes of <u>Miranda</u> — the determination as to whether an individual is in 'custody' requires an objective determination of the totality of the circumstances."  But Sagapolutele-Silva contends that the ICA erred by holding that she was not in custody during the "separate and distinct" investigation for OVUII.[9]

---

[8]    The State's application notes that the "either/or" rule, established in <u>State v. Ketchum</u>, 97 Hawaiʻi 107, 126, 34 P.3d 1006, 1025 (2001), "is at variance with" <u>Wyatt</u>'s "totality of circumstances" rule and internally inconsistent with other parts of <u>Ketchum</u>.  The State "asks this Court to clarify that custody for <u>Miranda</u> purposes should be based on a totality of the circumstances and overrule any cases to the extent that they suggest otherwise."

[9]    The application suggests that because of this framing, the ICA held Sagapolutele-Silva "was therefore not subjected to 'custodial interrogation.'"  To the contrary, the ICA agreed that she was in custody, citing, in part, the existence of probable cause to arrest for excessive speeding, which "taint[ed]" the OVUII investigation.  <u>Sagapolutele-Silva</u>, 147 Hawaiʻi at 101, 464 P.3d at 889.
        Sagapolutele-Silva's application additionally challenges the ICA's holding that only some of the questions asked during the encounter were
(continued...)

### III. STANDARD OF REVIEW

"An appellate court reviews a ruling on a motion to suppress de novo to determine whether the ruling was 'right' or 'wrong.'" State v. Weldon, 144 Hawaiʻi 522, 530, 445 P.3d 103, 111 (2019) (quoting State v. Tominiko, 126 Hawaiʻi 68, 75, 266 P.3d 1122, 1129 (2011)).

### IV. DISCUSSION

The self-incrimination clause of article I, section 10 of the Hawaiʻi Constitution[10] ensures that "a police officer may not undermine a person's privilege against compelled self-incrimination by subjugating his or her will to that of examining police officer." State v. Ah Loo, 94 Hawaiʻi 207, 210, 10 P.3d 728, 731 (2000). This privilege "provides us with some of our most treasured protections — preservation of our autonomy, privacy, and dignity against the threat of state action." State v. Kamanaʻo, 103 Hawaiʻi 315, 320, 82 P.3d 401, 406 (2003) (quoting State v. Reyes, 93 Hawaiʻi 321, 329, 2 P.3d 725, 733 (App. 2000)). In order to safeguard this right, before police can interrogate a suspect in custody, "the person must be

---

(continued . . .)
interrogation and its failure to address fruits of the poisonous tree argument. For the reasons discussed below, we need not reach these issues based on our resolution of this case.

[10] Article 1, section 10 of the Hawaiʻi Constitution states in pertinent part that no person "shall ... be compelled in any criminal case to be a witness against oneself."

warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Miranda v. Arizona, 384 U.S. 436, 444 (1966); id. at 455 ("Even without employing brutality, . . . the very fact of custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals.").

Miranda warnings are also mandated under the Hawaiʻi Constitution, State v. Santiago, 53 Haw. 254, 265–66, 492 P.2d 657, 664 (1971) ("We hold today that the protections which the United States Supreme Court enumerated in Miranda have an independent source in the Hawai[ʻ]i Constitution's privilege against self-incrimination."), and we have provided broader protections under our constitution than exist under the United States Constitution, id. at 263, 266, 492 P.2d at 662, 664 (rejecting Harris v. New York, 401 U.S. 222 (1971), and holding that defendant who testifies cannot be impeached with statements obtained in violation of Miranda).

The threshold question for a Miranda analysis is whether the defendant was subjected to "custodial interrogation," defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Melemai, 64 Haw. at 481, 643 P.2d at 543

13

(quoting Miranda, 384 U.S. at 444). Here, the district court and ICA held that Sagapolutele-Silva was both (1) in custody and (2) interrogated, and therefore, Miranda warnings were required. For the following reasons, we disagree with the first conclusion.

**A. Although Our Cases Emphasize That the Relevant Inquiry is the Totality of the Circumstances, Some Decisions Have Suggested That the Existence of Probable Cause is Determinative**

As noted above, both parties agree that the existence of probable cause should not be outcome determinative when analyzing whether a suspect is in custody for purposes of Miranda. But when the ICA homed in on whether probable cause had developed in this case, it did so because, although this court has repeatedly stated that the test turns on the totality of the circumstances, some of our precedent also suggests that probable cause, standing alone, is enough to establish a suspect was in custody:

> [W]e hold that a person is "in custody" for purposes of article I, section 10 of the Hawai'i Constitution if an objective assessment of the totality of the circumstances reflects either (1) that the person has become impliedly accused of committing a crime because the questions of the police have become sustained and coercive, such that they are no longer reasonably designed briefly to confirm or dispel their reasonable suspicion or (2) that the point of arrest has arrived because either (a) probable cause to arrest has developed or (b) the police have subjected the person to an unlawful "de facto" arrest without probable cause to do so.

State v. Ketchum, 97 Hawai'i 107, 126, 34 P.3d 1006, 1025 (2001) (emphases added).

14

We take this opportunity to clarify. To determine whether a suspect is in custody for Miranda purposes under article I, section 10 of the Hawaiʻi Constitution, a court must consider the totality of the circumstances, objectively appraised. The relevant circumstances are those that "betoken[] a significant deprivation of freedom, 'such that an innocent person could reasonably have believed that he or she was not free to go and that he or she was being taken into custody indefinitely.'" Id. at 125, 34 P.3d at 1024 (alterations omitted) (quoting Kraus v. County of Pierce, 793 F.2d 1105, 1109 (9th Cir. 1986)). While the existence of probable cause is relevant, it is not dispositive in every case.

1. **Our cases have never abrogated the totality-of-the-circumstances inquiry, although they recognize the relevance of probable cause to arrest**

Our cases have consistently emphasized that the totality of the circumstances should be evaluated in determining when a person is in custody for Miranda purposes. They have also consistently noted that the existence of probable cause to arrest is relevant to that analysis. Although Ketchum indicated that the existence of probable cause is determinative of custody, it never abrogated the totality-of-the-circumstances test – to the contrary, it explicitly affirmed it. Moreover, far from overruling cases like Wyatt and Kuba, which applied the test to traffic stops, Ketchum cited them in support.

15

Fifty years ago, in State v. Kalai, police went to the defendant's home to ask what he knew about a shooting that had occurred two days prior. 56 Haw. 366, 369, 537 P.2d 8, 11 (1975). We noted that:

> What constitutes custodial interrogation outside of the police station, however, necessarily depends upon the circumstances of the particular case; and whether the compulsive factors with which Miranda was concerned are present must be determined from the totality of the circumstances. One important factor is the degree to which the investigation has focused upon a specific individual, for once a particular individual becomes a prime suspect, he must be advised of his constitutional rights before any attempt is made to interrogate him.

Id. (citations omitted).

We observed that the investigation had not yet "zeroed in" on the defendant, that the defendant voluntarily let the officers into his home, spoke with them freely, and that "[n]o questions were asked which might have been calculated to elicit admissions placing him at the scene" or linking him to the weapon that was used. Id. at 370, 537 P.2d at 12. Considering all the circumstances, we concluded that defendant was not in custody.

Even after the United States Supreme Court held the following year, in Beckwith v. United States, 425 U.S. 341, 347 (1976), that whether or not the defendant is the "focus" of the investigation is immaterial,[11] this court continued to recognize

---

[11] The Court held that the relevant question is whether the defendant was subjected to a "custodial situation," and noted that it is "the
(continued...)

that the focus of the investigation is a significant factor.

See, e.g., Melemai, 64 Haw. at 481, 643 P.2d at 544; State v. Patterson, 59 Haw. 357, 361, 581 P.2d 752, 755 (1978). In Patterson, police responding to a report of a burglary in progress at 3 a.m. briefly questioned the defendant outside of a home; we held that Miranda warnings were not required. Citing Beckwith, 425 U.S. at 347, we noted that the "focus of the investigation upon the defendant, standing alone, will not trigger the application of the Miranda rule," but acknowledged that it continued to be an "important factor." Patterson, 59 Haw. at 361, 581 P.2d at 755. We emphasized that the test requires consideration of the totality of the circumstances, including probable cause:

> Where the police, prior to questioning the individual, are in possession of facts sufficient to effect an arrest without a warrant based on probable cause, it is less likely that the person confronted would be allowed to come and go as he pleases. The degree of this likelihood may, of course, depend upon the nature and gravity of the offense, as well as other circumstances. In any event, whether the defendant was in custody or otherwise deprived of his freedom of action for Miranda purposes is to be determined from the totality of the circumstances, objectively appraised. These would include the place and time of the interrogation, the length of the interrogation, the nature of the questions asked, the conduct of the police, and all other relevant circumstances.

Id. (emphasis added) (citations omitted).

---

(continued . . .)
compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted," that determines whether Miranda warnings are required. Beckwith, 426 U.S. at 346-347 (quoting United States v. Caiello, 420 F.2d 471, 473 (2d Cir. 1969)).

Patterson thus indicated that probable cause was suggestive of custody – a circumstance that might serve as an indicator that the point of arrest has arrived.[12]

Following Patterson, this court continued to hold that "[p]robable cause to arrest is . . . not determinative, but it may play a significant role in the application of the Miranda rule." Melemai, 64 Haw. at 481, 643 P.2d at 544.[13] In Melemai, the police were investigating a hit and run in which a jogger was struck by a pickup truck. Id. at 480, 643 P.2d at 543. The license plate of the vehicle involved in the accident was registered to the defendant. Police went to the defendant's home, and the defendant arrived in a vehicle matching the

---

[12]    Justice Wilson suggests that Patterson adopted a bright-line rule regarding the significance of probable cause. Dissent at 3-4. However, respectfully, he fails to consider the context surrounding the passage he quotes, which suggests to the contrary that all of the circumstances must be considered:

> No precise line can be drawn because each case must necessarily turn upon its own facts and circumstances, but we think that the California court in People v. Manis, 268 Cal.App.2d 653, 669, 74 Cal.Rptr. 423, 433 (1969) came as close as any to delineating, generally, the outer parameters beyond which on-the-scene interviews may not proceed without the Miranda warnings:
> "(P)ersons temporarily detained for brief questioning by police officers who lack probable cause to make an arrest or bring an accusation need not be warned about incrimination and their right to counsel, until such time as the point of arrest or accusation has been reached or the questioning has ceased to be brief and casual and become sustained and coercive."

Patterson, 59 Haw. at 362-63, 581 P.2d at 755-56 (emphasis added).

[13]    In Melemai, we held that two factors — whether the investigation had focused on the defendant and whether probable cause existed — "may play a significant role in the application of the Miranda rule." 64 Haw. at 481, 643 P.2d at 544.

description given by a witness to the accident. Officers asked the defendant to exit his vehicle and for his driver's license. When the defendant complied, they asked him "if he had hit anyone with his car, and defendant answered in the affirmative." Id. The police officers then asked why the defendant had left the scene, and the defendant answered. Id.

We held that the defendant's admission that he hit the jogger gave the police probable cause. "Inasmuch as the totality of circumstances created the kind of coercive atmosphere that Miranda warnings were designed to prevent, custody attached and Miranda warnings were required. Based upon our analysis, the defendant's answer to the first question was admissible while his answer to the second was not." Id. at 482, 643 P.2d at 544.

We later revisited this issue in Ah Loo. The defendant there was observed by police holding a beer while he stood with a group of people; when officers "detained the group" and asked the defendant his name, age, and residential address, he admitted he was underage. 94 Hawai'i at 209, 10 P.3d at 730. We held that a defendant is not in custody if, during a "temporary investigative detention," the police officer "poses noncoercive questions to the detained person that are designed to confirm or dispel the officer's reasonable suspicion." Id. at 211, 10 P.3d at 732. In other words, we clarified that "an

individual may very well be 'seized'" pursuant to search and seizure doctrine "and yet not be 'in custody,' such that <u>Miranda</u> warnings are required as a precondition to any questioning." <u>Id.</u> This court cited the rule from <u>Melemai</u> that "if neither probable cause to arrest nor sustained and coercive interrogation are present, then questions posed by the police do not rise to the level of 'custodial interrogation' requiring <u>Miranda</u> warnings." <u>Ah Loo</u>, 94 Hawai'i at 210, 10 P.3d at 731. In a parenthetical, we cited <u>Melemai</u> for the proposition that "'custody' did not occur until after defendant's admission of culpability — uttered in response to [the] police officer's question — gave [the] officer probable cause to arrest." <u>Id.</u> at 211, 10 P.3d at 732.

Accordingly, citing <u>Melemai</u>, we formulated the rule as follows:

> <u>[I]f the detained person's responses to a police officer's questions provide the officer with probable cause to arrest</u> or, alternatively, if officer's questions become sustained and coercive (such that the officer's questions are no longer reasonably designed to briefly confirm or dispel his or her reasonable suspicion), the officer is — at <u>that</u> time — required to inform the detained person of his or her constitutional rights against self-incrimination and to counsel, as mandated by <u>Miranda</u> and its progeny.

<u>Id.</u> at 212, 10 P.3d at 733 (first emphasis added).

Thus, up to and including our decision in <u>Ah Loo</u>, our cases did not indicate that the existence of probable cause alone was dispositive. Rather, it was a factor to be considered in light of all the circumstances. Where probable cause

20

developed during the course of the officer's questioning of the defendant — such as when the defendant admitted hitting a jogger in Melemai — custody would attach.

That approach makes sense, since the questions and responses would factor into assessing the coerciveness of the situation from the defendant's point of view. In Melemai, probable cause developed at the scene, in the presence of the defendant, when the defendant answered affirmatively to the officer's question "if he had hit anyone with his car." 64 Haw. at 480, 643 P.2d at 543. That question and the defendant's answer contributed to a coercive atmosphere of which the defendant was aware. Id. at 482, 643 P.2d at 544; see also State v. Hoffman, 73 Haw. 41, 54, 828 P.2d 805, 813 (1992) (applying Melemai to hold that custody attached when the police obtained probable cause because defendant admitted to possessing a bottle of beer in a public park); State v. Russo, 67 Haw. 126, 135-36 & n.6, 681 P.2d 553, 560-61 & n.6 (1984) (officers went to defendant's apartment at 4 a.m. to question him about a murder; Miranda warnings required after defendant told them that he had recently purchased a handgun and that it was in his car, which "matched" the description of a car used during the murder).

A year after Ah Loo, we considered custody under vastly different circumstances in Ketchum. There, a search

21

warrant was executed by at least 60 officers at a home at 7 a.m. Ketchum, 97 Hawai'i at 111, 34 P.3d at 1010. The officers broke into the house, encountered Ketchum and a co-defendant in a bedroom, ordered them to show their hands, and within a minute asked Ketchum for personal information including his address. Considering all of the circumstances, including the display of force by the officers, we concluded that Ketchum had been "de facto" arrested since a reasonable person in his position would have understood that they were being detained indefinitely. Id. at 111-12, 127, 34 P.3d at 1010-11, 1026.

During the course of our analysis, we reviewed our precedent, including Ah Loo, which we characterized as holding that a detainee is in custody when they are "expressly or impliedly accused of having committed a crime." Id. at 124, 34 P.3d at 1023 (emphasis added). We acknowledged that "we look to the totality of the circumstances," id. at 122, 34 P.3d at 1021 (quoting Ah Loo, 94 Hawai'i at 210, 10 P.3d at 731), that "there is no simple or precise bright line delineating when 'the point of arrest' has arrived," and that "no single factor, in itself, is dispositive as to when a temporary investigative detention has morphed into an arrest," id. at 125, 34 P.3d at 1024. We then adopted the following two-part, either/or test to determine at what point the investigatory detention becomes custody:

> In summary, we hold that a person is "in custody" for purposes of article I, section 10 of the Hawaiʻi Constitution if an objective assessment of the totality of the circumstances reflects either (1) that the person has become impliedly accused of committing a crime because the questions of the police have become sustained and coercive, such that they are no longer reasonably designed briefly to confirm or dispel their reasonable suspicion or (2) that the point of arrest has arrived because either (a) <u>probable cause to arrest has developed</u> or (b) the police have subjected the person to an unlawful "<u>de facto</u>" arrest without probable cause to do so.

<u>Id.</u> at 126, 34 P.3d at 1025 (first emphasis added).[14]

Although seemingly adopting a bright-line rule that the existence of probable cause is dispositive, <u>Ketchum</u> did not explicitly overrule our precedent indicating that the determination of custody requires an evaluation of all the circumstances. To the contrary, <u>Ketchum</u> expressly affirmed not only the totality-of-the-circumstances test, but also <u>Wyatt</u> and <u>Kuba</u>, both of which evaluated the totality of the circumstances surrounding traffic stops:

> The concurring and dissenting opinion "disagree[s] with the totality of the circumstances formulation seemingly adopted" by us "in this case." Acoba and Ramil, JJ., concurring in part and dissenting in part . . . , at 129, 34 P.3d at 1028. <u>However, this court consistently addresses the question whether a defendant has been subjected to custodial interrogation within the context of</u>

_____

[14] One year after <u>Ketchum</u>, we again relied on <u>Ah Loo</u> in <u>State v. Kaleohano</u>, 99 Hawaiʻi 370, 378, 56 P.3d 138, 146 (2002). In <u>Kaleohano</u>, we held that the defendant — who had been pulled over for a traffic violation and detained on suspicion of OVUII — was not in custody. Without quoting the either/or test from <u>Ketchum</u>, <u>Kaleohano</u> emphasized the importance of probable cause for determining custody: "<u>Ah Loo</u> recognized that, 'if neither probable cause to arrest nor sustained and coercive interrogation are present, then questions posed by the police do not rise to the level of "custodial interrogation" requiring <u>Miranda</u> warnings.' We, therefore, examine whether [the police officer] had probable cause to arrest [the defendant]." <u>Id.</u> at 377, 56 P.3d at 145 (citation omitted) (quoting <u>Ah Loo</u>, 94 Hawaiʻi at 210, 10 P.3d at 731).

23

> the totality of the circumstances. . . . We therefore do not understand our opinion to be "adopt[ing]" a new approach in analyzing whether custodial interrogation has occurred for Miranda purposes.

Id. at 117 n.19, 34 P.3d at 1017 n.19 (emphasis added) (citations omitted) (citing Ah Loo, 94 Hawai'i at 210, 10 P.3d at 731; Kuba, 68 Haw. at 188-90, 706 P.2d at 1309-10; Wyatt, 67 Haw. at 299, 687 P.2d at 549; Patterson, 59 Haw. at 361, 581 P.2d at 755; Kalai, 56 Haw. at 369, 537 P.2d at 11).

Furthermore, Ketchum did not present the circumstances present here, where the officer had probable cause to arrest before engaging with the defendant and did not communicate that fact to the defendant.[15]

2.   **The totality-of-the-circumstances approach, applied in Wyatt and Kuba, is valid and applies to this case**

We hereby clarify that the totality-of-the-circumstances approach to traffic stops adopted in Wyatt and Kuba and affirmed in Ketchum remains valid and applies to this case.  The existence of probable cause, while relevant, is not dispositive, and the proper inquiry in determining whether a defendant is in custody for Miranda purposes remains the totality of the circumstances.

---

[15]   Although Officer Termeteet told Sagapolutele-Silva that she was "speeding," he did not advise her that her speeding was subject to criminal sanctions.  Speeding less than thirty miles per hour over the speed limit is a non-criminal violation.  See, e.g., State v. Fitzwater, 122 Hawai'i 354, 378, 227 P.3d 520, 544 (2010), as amended (Apr. 5, 2010) (remanding for entry of judgment of a non-criminal traffic infraction because the evidence did not prove that the defendant exceeded the speed limit by at least thirty miles per hour).

Both our cases and federal courts are in accord that traffic stops are treated under a totality-of-the-circumstances analysis.  In Berkemer v. McCarty, the United States Supreme Court rejected a "rule under which questioning of a suspect detained pursuant to a traffic stop would be deemed 'custodial interrogation' if and only if the police officer had probable cause to arrest the motorist for a crime," explaining:

> The threat to a citizen's Fifth Amendment rights that Miranda was designed to neutralize has little to do with the strength of an interrogating officer's suspicions. And, by requiring a policeman conversing with a motorist constantly to monitor the information available to him to determine when it becomes sufficient to establish probable cause, the rule proposed by respondent would be extremely difficult to administer.

468 U.S. 420, 435 n.22 (1984).

The defendant in Berkemer was pulled over after a state trooper saw him weaving in and out of traffic.  After the defendant exited his vehicle, the officer noticed he had trouble standing and decided to charge him with a traffic offense and to prevent him from leaving the scene.  Id. at 423.  The Supreme Court held that Miranda warnings were not required, and distinguished roadside stops from the circumstances at issue in Miranda and its progeny.  Id. at 441.  First, during ordinary traffic stops, detentions are usually brief and presumptively temporary; second, traffic stops are usually conducted in public, where the atmosphere is "substantially less 'police dominated.'"  Id. at 439-40.  While roadside stops may morph

25

into custodial situations if the defendant is "subjected to treatment that renders him 'in custody' for practical purposes," the Court did not find those circumstances present here.  Id. at 440 (citation omitted).  The Court explained,

> Only a short period of time elapsed between the stop and the arrest.  At no point during that interval was respondent informed that his detention would not be temporary.  Although [the arresting officer] apparently decided as soon as respondent stepped out of his car that respondent would be taken into custody and charged with a traffic offense, [the officer] never communicated his intention to respondent.  A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.

Id. at 441-42.

As we explained in Wyatt, "the ultimate test is whether the questioning was of a nature that 'would "subjugate the individual to the will of his examiner" and thereby undermine the privilege against compulsory self-incrimination.'" 67 Haw. at 299, 687 P.2d at 549 (quoting Rhode Island v. Innis, 446 U.S. 291, 299 (1980)).  The question of custody therefore turns on the perceptions of a reasonable person in the detainee's position.[16]  Ketchum, 97 Hawai'i at 125, 34 P.3d at

---

[16]    Indeed, Sagapolutele-Silva faults the ICA for treating the OVUII as a "separate and distinct" OVUII investigation in which probable cause had not yet developed, and we agree that this bifurcation of the traffic stop into two investigations for two crimes – while understandable given our either/or test – does not reflect reality.  A suspect probably does not perceive two separate and concurrent investigations during a single police encounter, and the existence of probable cause for one crime, but not the other, is unlikely to impact whether a reasonable person in the suspect's position would perceive themselves as effectively under arrest.

1024 (reciting the test as whether "[an] innocent person could reasonably have believed that he [or she] was not free to go and that he [or she] was being taken into custody indefinitely" (quoting Kraus, 793 F.2d at 1109)).  While "[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned," they "are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her '"freedom of action."'"  Stansbury v. California, 511 U.S. 318, 325 (1994) (citations omitted) (quoting Berkemer, 468 U.S. at 440).  The existence of probable cause that is not disclosed to the suspect — as opposed to when a suspect is confronted with the officer's suspicions, or the evidence supporting them — is unlikely to impact the suspect's perceptions of the encounter.[17]  By the same

---

[17]     Our review of other jurisdictions suggests that, consistent with the principle that the objective perspective of the suspect controls, probable cause usually fits into the totality-of-the-circumstances analysis as follows:

> [W]hile the place of the interrogation is a very significant factor, it must be considered together with the other surrounding circumstances.  In ascertaining, as called for by Miranda, whether the deprivation of freedom of action was "significant" (i.e., whether the circumstances were "likely to affect substantially the individual's 'will to resist and compel him to speak where he would not otherwise do so freely'"), it is particularly important whether some indicia of arrest are present.  A Court is not likely to find custody for Miranda purposes if the police were not even in a position to physically seize the suspect, but is likely to find custody if there was physical restraint such as handcuffing, drawing a gun,

(continued...)

token, an after-the-fact determination that the police could have arrested the detainee should play little role in determining whether or not the detainee felt they were under arrest.

As discussed earlier, see supra section IV.A.1, our cases recognize that it is highly relevant when probable cause develops during the course of questioning the defendant. See, e.g., Melemai, 64 Haw. at 482, 643 P.2d at 544 (holding Miranda warnings were required where probable cause developed at the scene and custody attached); see also Ah Loo, 94 Hawai'i at 212, 10 P.3d at 733 ("[I]f the detained person's responses to a police officer's questions provide the officer with probable cause to arrest . . . the officer is — at that time — required to [provide Miranda warnings]."). The defendant is present

_____

(continued . . .)
> holding by the arm, or placing into a police car. Merely having the suspect move a short distance to facilitate conversion does not itself constitute custody. Also relevant are whether or not the suspect was "confronted with evidence that was at least sufficient to establish probable cause," or was told that there was a warrant for his arrest or, on the other hand, that he was free to leave and, if the events occur at the station, whether or not booking procedures were employed.

2 Wayne R. LaFave et al., Criminal Procedure § 6.6(f) (4th ed. 2021) (emphasis added) (footnotes omitted); see, e.g., State v. Williams, 15 A.3d 753, 755 (Me. 2011) (explaining the factors used to determine whether a suspect was in custody, including "the existence or non-existence of probable cause to arrest (to the extent communicated to the defendant)" (emphasis added)); People v. Null, 233 P.3d 670, 677 (Colo. 2010) (holding that the defendant was in custody because, inter alia, defendant knew the police had grounds to arrest him); State v. Ortiz, 382 S.W.3d 367, 373 (Tex. Crim. App. 2012) (noting that a suspect may be in custody "if the officer manifests his belief to the detainee that he is a suspect").

during that questioning, and both the officer's questions and the defendant's answers can contribute to a coercive atmosphere of which the defendant is aware.

However, probable cause developed prior to the officer's questioning of the suspect is a far different matter. While we have recognized that it is relevant to assessing whether the defendant was in fact free to leave, see Patterson, 59 Haw. at 361, 581 P.2d at 755 ("Where the police, prior to questioning the individual, are in possession of facts sufficient to effect an arrest without a warrant based on probable cause, it is less likely that the person confronted would be allowed to come and go as he pleases."), it has limited relevance to assessing the coerciveness of the encounter from the defendant's point of view. The instant case provides a good example: although Officer Termeteet told Sagapolutele-Silva that she had been "speeding," and although she acknowledged that to be the case, there is nothing to indicate that Sagapolutele-Silva understood that she had implicated herself in a crime. Indeed, had she been going only three miles per hour slower, Officer Termeteet would not have had probable cause to arrest her for excessive speeding.

In Wyatt, we considered whether Miranda warnings were required for "roadside questioning of the defendant after she was stopped for operating a motor vehicle on a street in Waikiki

29

without lighted headlamps in violation of the City's traffic code." 67 Haw. at 298, 687 P.2d at 549. The officer there directed the defendant to pull her vehicle over, asked for her documents, and noticed a smell of liquor emanating from the vehicle. He asked the defendant if she had been drinking, which she "readily admitted." Id. at 296-97, 687 P.2d at 547-48. He then asked if she would be willing to perform a field sobriety test, and she agreed. The test indicated she might have been under the influence of intoxicants, and she was arrested. Id. at 297, 687 P.2d at 548.

We held that the officer was not required to advise the defendant of her Miranda rights before asking her if she had been drinking, noting:

> [T]he record does not reveal the intimidating or inherently coercive factors usually extant when interrogation is conducted in a custodial setting. Rather, what transpired here may be more aptly described as on-the-scene questioning of brief duration conducted prior to arrest in public view. In short, the circumstances surrounding the incident cannot support an inference that Miranda rights were triggered yet ignored; for nothing in the record suggests the setting was custodial or that the interrogation was of a nature likely to subjugate the defendant to the will of her examiner and undermine the constitutionally guaranteed privilege against self-incrimination.

Id. at 300-301, 687 P.2d at 550 (footnote omitted).

A year later, we affirmed the holding in Wyatt under "almost indistinguishable" facts in Kuba. There, the defendant was stopped by police after straddling two lanes and traveling five miles per hour in a twenty-five mile per hour zone. Kuba,

68 Haw. at 185, 706 P.2d at 1307. An officer stopped the defendant, requested his license, and asked him to step out of the vehicle. The officer observed that the defendant appeared disoriented and unsteady on his feet. The officer told the defendant the reason for the stop and informed him that he suspected the defendant of driving while intoxicated. The defendant responded that he had consumed four beers at a downtown bar, and the officer asked him if he "normally gets wasted on four beers." Id. In response, the defendant stated that he had "also smoked some marijuana." Id. at 185-86, 706 P.2d at 1307. After failing a field sobriety test, the defendant was arrested for driving under the influence of alcohol in violation of HRS § 291-4 (1976).[18] Id. at 186, 706 P.2d at 1308.

As in Wyatt, we held that the officer was not required to advise Kuba of her Miranda rights before asking questions. Id. at 189, 706 P.2d at 1310. We noted that the officer's roadside questioning, "similar to that in Wyatt," was composed of "legitimate, straightforward, and noncoercive question[s] necessary to obtain information to issue a traffic citation." Id. at 188-89, 706 P.2d at 1309-10.

---

[18] This charge was later amended to a charge of driving while under the influence of drugs in violation of HRS § 291-7 (1976). Id.

Nothing in Wyatt or Kuba suggests that the existence of probable cause should be dispositive of whether the defendant was in custody. Significantly, the defendant in Wyatt had been observed by the officer driving without her lights on, which we noted was defined by the Traffic Code of the City and County of Honolulu as a misdemeanor punishable by up to ten days in prison for a first offense. Wyatt, 67 Haw. at 296 n.3, 687 P.2d at 547 n.3. Yet the existence of probable cause to arrest for that criminal offense did not enter into this court's consideration in either case.[19] Rather, this court focused on the coerciveness of the encounter viewed in light of the totality of the circumstances. Wyatt, 67 Haw. at 299, 687 P.2d at 549; see also Kuba, 68 Haw. at 189, 706 P.2d at 1309-10.

That approach should be upheld, especially in the traffic context, because it allows police to adequately investigate before deciding whether to arrest a suspect or to simply issue a citation. See Patterson, 59 Haw. at 361-362, 581 P.2d at 755 ("The adoption of the Miranda rule . . . was never intended to hamper law enforcement agencies in the exercise of their investigative duties or in the performance of their traditional investigatory functions."). A rule that a detainee

---

[19] We noted in passing that "[t]he obvious violation of the Traffic Code gave [the officers] reason to seek information necessary for the issuance of a citation." Wyatt, 67 Haw. at 300, 687 P.2d at 549. However, under HRS § 803-5 (1982), the officers could have arrested the defendant since it was a criminal offense.

is in custody from the moment probable cause exists, and must accordingly be advised of their <u>Miranda</u> rights before any questioning can take place, effectively requires police officers to make an "'all or nothing' choice between arrest and inaction," which is precisely the situation that investigatory detentions were intended to prevent. <u>Ah Loo</u>, 94 Hawai'i at 211, 10 P.3d at 732 (quoting <u>Patterson</u>, 59 Haw. at 363, 581 P.2d at 756); <u>see also</u> <u>Kernan v. Tanaka</u>, 75 Haw. 1, 38 n.23, 856 P.2d 1207, 1226 n.23 (1993) ("We do not require the police to have probable cause to arrest prior to the administration of the field sobriety test because such a requirement unduly burdens law enforcement.").

Here, when Officer Termeteet approached Sagapolutele-Silva's vehicle, he noticed the odor of alcohol coming from inside and, during the course of requesting her documents, noted that she had red, watery, and glassy eyes. He suspected she may have been drinking, and asked "if she can do the field sobriety test to make sure she was safe to drive." Under the bright-line, either/or rule applied by the district court here, Officer Termeteet would have been required to give <u>Miranda</u> warnings to Sagapolutele-Silva as soon as he approached her vehicle, before he could question her. If she had invoked her right to remain silent or to have counsel present, Officer Termeteet would not have been able to conduct a field sobriety test to determine

whether she was safe to drive and would have been forced to decide on other facts whether to arrest her or to simply cite her and allow her to drive away.[20]

A bright-line test focusing on probable cause does not, therefore, serve the purpose of the Miranda rule: to prevent the police from coercing suspects into answering incriminating questions against their will. See Howes v. Fields, 565 U.S. 499, 508–09 (2012) ("'[C]ustody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion."); Melemai, 64 Haw. at 482, 643 P.2d at 544 (holding Miranda warnings were required when "the totality of circumstances created the kind of coercive atmosphere that Miranda warnings were designed to prevent"). In this case, Officer Termeteet's questioning was properly limited to "that which was minimally necessary for him to decide upon a reasonable course of investigatory action." Patterson, 59 Haw. at 364, 581 P.2d at 756.

For the foregoing reasons, we reaffirm that whether or not a defendant is "in custody" requires "objectively appraising the totality of the circumstances." Melemai, 64 Haw. at 481,

---

[20] Officer Termeteet was not required by law to arrest Sagapolutele-Silva for excessive speeding — as he testified at the suppression hearing, he had the discretion to issue a citation for excessive speeding and allow her to drive away. But his decision on whether to cite or arrest her had significant public safety consequences. As he testified, he wanted to administer the SFST because "I don't want her, you know, cite her for the excessive speeding and then she hurts herself or another person afterwards."

643 P.2d at 544. Courts may consider probable cause as part of that inquiry — and indeed, they should if the circumstances warrant it, such as when the suspect is confronted with the facts that establish probable cause. But the ultimate touchstone is whether, under an objective view of the totality of the circumstances, the de facto point of arrest has arrived. Ketchum, 97 Hawai'i at 125, 34 P.3d at 1024.

**B.    Under the Totality of the Circumstances, Sagapolutele-Silva Was Not in Custody**

The totality-of-the-circumstances custody analysis looks for "any . . . event[s] or condition[s] that betoken[] a significant deprivation of freedom, 'such that an innocent person could reasonably have believed that he or she was not free to go and that he or she was being taken into custody indefinitely.'" Id. (alterations omitted) (quoting Kraus, 793 F.2d at 1109). And "the ultimate test is whether the questioning was of a nature that 'would "subjugate the individual to the will of his examiner" and thereby undermine the privilege against compulsory self-incrimination.'" Wyatt, 67 Haw. at 299, 687 P.2d at 549 (quoting Innis, 446 U.S. at 299). Relevant factors include: "the time, place and length of the interrogation, the nature of the questions asked, and the conduct of the police at the time of the interrogation." Id. (alterations omitted) (quoting State v. Paahana, 66 Haw. 499,

503, 666 P.2d 592, 595 (1983)). "[W]hether the investigation has focused on the suspect and whether the police have probable cause to arrest him prior to questioning" may be relevant, but not dispositive. Melemai, 64 Haw. at 481, 643 P.2d at 544. A temporary investigative detention — such as a routine traffic stop — is often not custodial under a totality-of-the-circumstances analysis. Ah Loo, 94 Hawai'i at 211, 10 P.3d at 732 ("[G]enerally speaking, a person lawfully subjected to a temporary investigative detention by a police officer . . . is not subjected to 'custodial interrogation' when the officer poses noncoercive questions to the detained person that are designed to confirm or dispel the officer's reasonable suspicion." (Citation omitted.)).

In considering whether a temporary detention has "morphed into an arrest," this court looks for factors traditionally associated with arrest, such as "handcuffing, leading the detainee to a different location, subjecting him or her to booking procedures, ordering his or her compliance with an officer's directives, using force, or displaying a show of authority beyond that inherent in the mere presence of a police officer." Ketchum, 97 Hawai'i at 125, 34 P.3d at 1024 (quoting Kraus, 793 F.2d at 1109); see also People v. Null, 233 P.3d 670, 676-77 (Colo. 2010) (holding traffic stop became custodial after the defendant failed several sobriety tests, including a

portable breath test, police surrounded the defendant and prevented him from walking away, and the defendant was detained for fifteen minutes).

Here, the totality of the circumstances show that Sagapolutele-Silva was not in custody for purposes of article I, section 10 of the Hawai'i Constitution until after the SFST. Although the district court concluded that "legal custody had attached," it made no finding that Sagapolutele-Silva's freedom of movement had been curtailed to a degree "that betoken[ed] a significant deprivation of freedom such that an innocent person could reasonably have believed that he or she was not free to go and that he or she was being taken into custody indefinitely." Ketchum, 97 Hawai'i at 125, 34 P.3d at 1024 (quotation marks, citation, and alterations omitted). And indeed, the relevant circumstances did not support such a finding. Although the officers had probable cause to arrest Sagapolutele-Silva for excessive speeding and she had become the focus of an OVUII investigation, the officers' conduct did not suggest that she was in fact under arrest until after the SFST. Before the SFST, Sagapolutele-Silva was not told she was being arrested; she was not handcuffed or taken to the police station; there were, at most, two officers present during the traffic stop, which occurred "in public view," Wyatt, 67 Haw. at 300, 687 P.2d at 550, and neither officer used physical force or displayed "a

37

show of authority beyond that inherent in the mere presence of a police officer," Ketchum, 97 Hawai'i at 125, 34 P.3d at 1024; see Patterson, 59 Haw. at 363-64, 581 P.2d at 756 (finding no custody where "[n]o guns were drawn and kept upon the defendant," "he [was not] confronted and subjected to an overbearing show of force," "[t]he interview itself was brief," and "[t]he questions were not couched in accusatory terms"). Although Sagapolutele-Silva exited her vehicle, that does not necessarily turn the traffic stop into a custodial arrest. See Kernan v. Tanaka, 75 Haw. 1, 38, 856 P.2d 1207, 1226 (1993) ("Ordering the driver to exit the vehicle is an extension of the [temporary investigative] seizure that must be accompanied by sufficient facts to support the officer's action.").

Under a totality-of-the-circumstances analysis, Sagapolutele-Silva was not in custody up to and during her performance on the SFST. Objectively viewed, the circumstances of the traffic stop did not rise to the level of a de facto arrest until after that point. Ketchum, 97 Hawai'i at 125, 34 P.3d at 1024. "Custody" is a necessary component of custodial interrogation, and so the conclusion that Sagapolutele-Silva was not in custody ends the inquiry — we need not and do not consider whether the officers "interrogated" her during the encounter. Her statements made during this pre-arrest period accordingly need not be suppressed for want of Miranda warnings.

In light of our conclusion that there was no custody in this case until after the SFST, any evidence suppressed as fruit of the poisonous tree likewise need not be suppressed.  We therefore vacate the district court's order suppressing all of Sagapolutele-Silva's statements up to, during, and after her performance on the SFST.[21]

### V. CONCLUSION

For the foregoing reasons, the ICA's June 19, 2020 judgment on appeal and the June 22, 2020 amended judgment on appeal are affirmed in part and vacated in part, and the district court's June 7, 2019 judgment and August 26, 2019 amended judgment are vacated.  This case is remanded to the district court for further proceedings consistent with this opinion.

| | |
|---|---|
| Brian R. Vincent | /s/ Mark E. Recktenwald |
| for Petitioner and Respondent | |
| State of Hawai'i | /s/ Paula A. Nakayama |
| | |
| Alen M. Kaneshiro | /s/ Paul B.K. Wong |
| for Respondent and Petitioner | |
| Tiana F.M. Sagapolutele-Silva | |



---

[21]  The district court suppressed Sagapolutele-Silva's statement that she had fewer drinks than her friends on the grounds that it was fruit of earlier improper questioning.  At the time she made that statement, she had been advised that she was under arrest.  We do not opine on whether some other ground might exist to suppress that statement.